(Court of Appeal, Parish of Orleans.)

## J. K. ARMSBY & CO. vs. SANTO OTERI.

1. Where the contract is entire and there is an essential or material deficiency or difference in the goods, the purchaser is not bound to accept and pay for either the whole or a part.
2. The issues of fact involved in this suit are resolved in favor of the defendant.

Appeal from Civil District Court, Division "C."

Saunders & Gurley, Hall & Monroe, for Plaintiff and Appellee.

Farrar, Jones & Kruttschnitt, for Defendant and Appellant.

ESTOPINAL, J. Plaintiff and defendant had a contract reading as follows:

"New Orleans, La., January 21, 1904.

"The J. K. Armsby Co., has this day sold, and S. Oteri has bought 3,000 boxes two-crown London Layer raisins, choice quality, crop of 1904, at $1.20 per box, F. O. B. California, less cash discount of one and one-half per cent. Shipments guaranteed on or before October 15th. The seller also agrees to take matter of delivery up with the Southern Pacific, and endeavor to get them to trace shipment through by wire, so as to obtain prompt delivery. Buyer to be advised of shipments and car number by wire.

"THE J. K. ARMSBY CO.

"Per A. W. Porter."

"February 3, 1904.

"It is further agreed that raisins must reach New Orleans on or before November 5, 1904, and, in the event of delay beyond date specified, buyer reserves the privilege of rejecting the goods.

"The above authorized by Armsby Co., as per telegram of yesterday.

"A. E. MORPHY, Broker.

"Accepted February 4, 1904, Santo Oteri."

Plaintiff delivered in New Orleans and tendered defendant

385

3,000 boxes of raisins. Defendant inspected them in cars, claimed they were not "two-crown London raisins, choice quality, crop of 1904," and refused to accept them. Plaintiff thereupon sold the raisins at public auction, after due advertisement, for a net price of $2,163.44, and sued defendant for the difference between $3,600, the net contract price, and $2,163.44, the net price realized at the auction sale.

The following agreement is in the record (p. 2):

"AGREEMENT. It is agreed by and between counsel for plaintiff and counsel for defendant that if the plaintiff is entitled to recover, he is entitled to recover the amount claimed; the defendant admitting that the annexed account sale of said raisins is correct.

"It is further admitted that, when the raisins arrived in New Orleans, the defendant demanded the right to inspect them before delivery, in the possession of the railroad, which right was granted by the plaintiff; that the defendant, after inspection, rejected said raisins, and so notified the agent of the plaintiff, General A. E. Morphy, of said rejection, and the only issue, by agreement, remaining in this case is whether the defendant was obliged to accept the shipment of raisins."

Under this accepted statement of the case there remains but two questions to settle, one of fact and the other of law, viz:

First—Were the raisins tendered "two-crown London layer raisins, choice quality; crop of 1904?"

Second—The evidence adduced in the case showing one car load of raisins to have been up to the grade contracted for, and the other car load to be below such grade, was defendant called upon to accept the good and reject the bad car, or reject both, as violative of the contract?

We have examined carefully the rather voluminous testimony in the record which satisfies us, notwithstanding some conflict, that the persons who testified in the case were in absolute good faith and truthful, and therefore, there is no question here of credibility. If such were the case we would defer to the judgment of the trial judge who enjoys the advantage of seeing the witnesses and hearing the testimony and permit that judgment to remain undisturbed, when, however, it is a matter of appreciation of testimony, there can and need be no hesitancy on

386

the part of the appellate court in reaching a finding different from that of the trial judge, when it is deemed justified by all the facts taken together.

To quote liberally from the testimony would make this opinion unnecessarily long, and we need only say that the testimony taken as a whole, satisfies us that the entire shipment of raisins did not come up to contract quality.

Some witnesses testified to the effect that the raisins were of the grade known as "Two-Crown London Layer," and that the next grade was "Number 3," an dthat there being no subdivision or other grade between 2 and 3, the word "choice," used in the contract was meaningless, mere surplusage; that the word was never used in such contracts. We incline to a contrary view. It is admitted that the defendant agreed to pay a large price for the raisins, and to have done so, it is evident he had been offered extraordinary inducements, and this we gathere from the testimony of the defendant and others. The defendant says:

"Allow me to say, judge, that never in the history of my business have I ever *purchased raisins so early in advance in the season*. If it was not for the *smooth talk of* Mr. Porter, of the firm of J. K. Armsby & Company, *he promised me so much,* with the General present, that naturally, I purchased. When questioned as to who wrote the contract the defendant answered that the contract came from the office of General A. E. Morphy, the local agent of plaintiff's and that he, (defendant), accepted it.

Again we find that F. U. Gray, a raisin packer, employed at the time as manager of the Fresno Home Packing Company, at California, whose testimony was taken by commission, says: "I have a distinct recollection that as manager of the Packing house at Selma, I superintended the packing of these particular raisins that were shipped to S. Oteri. *I received special instructions from L. R. Payne, General Superintendent of the Fresno Home Packing Company, to see that this shipment to S. Oteri, was of the best that could be obtained. The special reason given was the very favorable price,"* and accordingly, that he made a special effort to get the best raisins obtainable. The same statement about the high price and consequent care is made by other witnesses.

337

Isn't it evident that the plaintiff, under the terms of its contract, realized that the defendant was entitled to *choice* raisins of two-crown grade?

Defendant was induced to buy this lot of raisins even before the crop was started, a thing he had neevr before done during his long business career as a fruit merchant. What induced him to do so? The fine *promises* of plaintiff's agent, Mr. Porter, at whose side stood the very honorable and upright local agent of plaintiff's, with whom the defendant was doubtless acquainted. Why should defendant, a veteran in the business, have paid a fancy price unless he was to be given an *article out of the ordinary?*

Instructions went forth from the plaintiff's superintendent to the packers that the shipment to Oteri must be of the best obtainable of the grade contracted for, because of the very favorable price. Plaintiff's good faith cannot be questioned, but were the raisins sent to defendant of the *grade* and *choice quality* intended by parties? This is the crucial question. The preponderance of the testimony indicates not. From the testimony of experts and others, it is established that there was a marked difference in the quality of the raisins in the two cars, one of the cars being said by one of the witnesses trashy (dark). Several witnesses examined on behalf of defendant say that the raisins in one of the cars were not merchantable and did not come up to grade "two-crown London Layer." That the raisins in this car were rainstained or rainrot; the boxes contained leaves, and that these raisins appeared old. The other car, say these witnesses, contained merchantable raisins, but they were found to be loosely packed, etc.

This testimony of defendant's witnesses is corroborated in the main by that of General Morphy, himself, who, on cross-examination, admits that there was a marked difference in the grade of the raisins in the two cars, but explains that one car might easily come up to the three-crown (1 grade higher than contract called for), and that the other car came up to the two-crown, grade called for. He admits, however, that some raisins in the car admittedly inferior of the two, were rainstained, and contained some little cobwebs.) When questioned as to the force and effect of the words "Choice quality," in the

contract, General Morphy replied: "Well, the words are there, but as a rule I don't know exactly what the word 'choice,' means, unless it applies to the standard raisins."

Again, this witness says:

"I would understand by that that they would be strictly up to standard and of 'no two-crown raisins.' *In selling raisins I never stipulate that in my contracts. This contract was made by Mr. Porter of the firm of Armsby and Company, who was here at the time.*"

This statement of General Morphy's is significant. We think the record establishes that it is usual to use the words "choice quality," and the witness says he never uses them in his contracts. This is Mr. Porter's contract. He used the words choice quality, and in consequence got a "very favorable price."

Under the circumstances we cannot conceive , nor is it possible to argue that the words are meaningless. It is evident that the expression used in the contract was not accidental.

Under the facts of this case we cannot consider it as not written. The evidence shows satisfactorily that one of the cars came up to the proper grade and quality, but that the other did not.

General Morphy, when testifying as to the difference in the raisins, says: He told Mr. Oteri "there may be cause for complaints, but how in God's world you want to reject that car, I can't see; I consider those raisins good enough for No. 3 crown."

Defendant urges that if all of contract raisins, 3000 boxes, did not come up to the contract grade and quality, that he was not bound to take a part, but had a right to reject thewhole, and this brings us to the second and a most important issue in the case.

The record shows that the 3000 boxes were contained in two cars, and that there was a marked difference in the quality of the raisins. It is also shown that one car of raisins were bought from the Dillion Vineyard, and the other from the Gray vineyard, two different farms. Hence, the difference in the quality of the raisins.

Defendant was entitled to a uniform grade of raisins and all up to contract grade.

From our view of the case, one half of the contract number cf boxes were not only unlike in quality to the other half, but were inferior and below the grade known as "two-crown London Layer raisins." Under the circumstances it was defendant's privilege to reject the entire shipment, since his acceptance, notwithstanding obvious bad conditions and low grade of raisins might have put a bar to his right to recover for any loss.

The contract under discussion was an entire executory contract for the sale and delivery of a certain quality of goods of a certain description, and plaintiff is not entitled to recover if a material part of them were neither conformable to the contract nor accepted by the defendant.

It has been held that there may be cases where a legal contract of sale, covering several articles may be severed, so that the purchaser may hold some of the articles purchased and not receiving (accepting) others, may recover back the price paid for them. Where a number of articles are bought at the same time, and a separate price agreed upon for each, although they are all included in one instrument of conveyance, yet the contract, for sufficient cause, may be rescinded as to part and the price paid recovered back, and may be enforced as to the residue. It has been held on the other hand that the legal principle governing in such cases, does not depend either solely or necessarily on the nature of the articles which are the subject of the contract, or on the prices affixed to each, but upon the nature of the contract itself. If the contract is entire, if it is one bargain, then it matters not whether there is one or are many articles. In the one case the vendor might have been willing to sell one portion without selling the whole, in another, the buyer might be unwilling to take a part unless he could have the whole.

The doctrine has been enunciated in a number of jurisdictions, and the adjudications are remarkable for their uniformity.

In support of his contention counsel for defendant has referred us to the following authorities: These we have read and find that they make conclusive, the legal proposition "That in an entire contract, where there is an essential or material de- to accept and pay for either the whole or a part.

Morrington v. Wight, 115, U. S. p. 188.

Kuhlman vs. Wood, 46 N. W. 738.

Clark vs. Baker, 5 Metcalf (Mass.), 452.

Morse vs. Brocket, 98 Mass. 205.

Wright vs. Bames, 14 Conn. 518.

St. Louis Paper Box Co. vs. Hubinger Bros. & Co., 100 Fed. Rep. 595.

Mansfield vs. Trigg, 113 Mass. 350.

Mary field vs. Converse, 105 Ill., 534.

Hale vs. Taylor, 45 N. H. 405.

Am. and Eng. Ency. of Law, Vol. 24, p. 1092.

Counsel for plaintiff has not deemed fit to discuss this phase of the defense set up, they relying entirely on the facts to gain their case. These we have resolved against their client, and applying the doctrine briefly discussed above, we conclude that the defendant is absolved from all liability under his contract with plaintiffs.

For the reasons assigned the judgment appealed from is reversed and set aside and the suit dismissed at plaintiff's costs in both Courts.